# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

————————————

Nº 06-CV-4814 (JFB) (MLO)

————————————

BARBARA AITKINS, BY KATHERINE CASILLAS, ATTORNEY-IN-FACT FOR BARBARA AITKINS,

Plaintiff and Counterclaim Defendant,

VERSUS

PARK PLACE ENTERTAINMENT CORPORATION EMPLOYEE BENEFIT PLAN AND HARRAH'S OPERATING COMPANY, INC. IN ITS CAPACITY AS PLAN ADMINISTRATOR OF PARK PLACE ENTERTAINMENT CORPORATION EMPLOYEE BENEFIT PLAN,

Defendants and Counterclaim Plaintiffs.

————————————

MEMORANDUM AND ORDER
March 25, 2008

————————————

JOSEPH F. BIANCO, District Judge:

Plaintiff Barbara Aitkins ("plaintiff" or "Aitkins"), by Katherine Casillas ("Casillas"), plaintiff's daughter and attorney-in-fact, brought the instant action against defendants Park Place Entertainment Corporation Employee Benefit Plan (the "Plan") and Harrah's Operating Company ("defendants"), pursuant to the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq.* ("ERISA"), challenging the termination of her long term disability ("LTD") benefits under the Plan and requesting that the Court direct defendants to retroactively adjust the date upon which plaintiff became entitled to LTD benefits. Specifically, plaintiff alleges that the decision to terminate her benefits by the Plan's administrator, Metropolitan Life Insurance Company ("MetLife"), was arbitrary and capricious. Plaintiff also alleges that she did not receive a full and fair review of her claim during MetLife's appellate process. Defendants counterclaimed, alleging that they were entitled to recover from Aitkins the

overpayment of her LTD benefits that arose retroactively from her award of benefits from the Social Security Administration.

Plaintiff and defendants now move for summary judgment pursuant to Federal Rule of Civil Procedure 56 on all of plaintiff's claims and on defendants' counterclaim. For the reasons set forth below, the Court grants plaintiff's motion for summary judgment to the extent that MetLife's denial of her appeal is vacated, and on her claim for retroactive adjustment of her disability start date, but denies the motion on all other grounds. Defendants' motion is granted on their counterclaim, but denied on all other grounds.

## I. FACTS[1]

## A. The Plan

The Plan is an employee welfare benefit plan governed by ERISA. (Summary Plan Description ("SPD") at "ERISA Information," "Statement of ERISA Rights".) Park Place Entertainment Corporation established and maintains the Plan to provide LTD benefits to eligible employees. (*See* SPD at i.) As the Plan's claims administrator, MetLife funds Plan benefits through a group policy of insurance. (SPD at i, "Erisa Information".)

### (1) Discretionary Authority

The Plan provides that "[i]n carrying out their respective responsibilities under the Plan, the Plan administrator and other Plan fiduciaries shall have discretionary authority to interpret the terms of the Plan and to determine eligibility

for and entitlement to Plan benefits in accordance with the terms of the Plan. Any interpretation or determination made pursuant to such discretionary authority shall be given full force and effect, unless it can be shown that the interpretation or determination was arbitrary and capricious." (SPD at "Claims Information".)

### (2) Eligibility for LTD Benefits

#### a. Definition of Disability

The SPD provides:

> "Disabled" or "Disability" means that, due to sickness, pregnancy or accidental injury, you are receiving Appropriate Care and Treatment from a Doctor on a continuing basis; and
> 1. during your Elimination Period and the next 24 month period, you are unable to earn more than 80% of your Predisability Earnings or Indexed Predisability Earnings . . . ; or
> 2. after the 24 month period, you are unable to earn more than 60% of your Indexed Predisability Earnings . . . .

(SPD at 6.)

The SPD further states that

> "Appropriate Care and Treatment" means medical care and treatment that meet all of the following:
> 1. it is received from a Doctor whose medical training and clinical experience are

---

[1] Unless otherwise indicated, all facts cited are undisputed. Further, all facts cited to bates-stamped documents are taken from Aitkins's Claim File, *i.e.,* from the administrative record.

suitable for treating your Disability

2. it is necessary to meet your basic health needs and is of demonstrable medical value;

3. it is consistent in type, frequency and duration of treatment with relevant guidelines of national medical, research and health care coverage organizations and governmental agencies;

4. it is consistent with the diagnosis of your condition; and

5. its purpose is maximizing your medical improvement.

(SPD at 7.)

### b. Elimination Period

The SPD defines an Elimination Period as "180 days of continuous Disability" (SPD at 2), which "begins on the day you become Disabled. It is a period of time during which no benefits are payable." (SPD at 6.)

The SPD further provides that "[y]ou may temporarily recover from your Disability during your Elimination Period. If you become disabled again due to the same or related condition, you may not have to begin a new Elimination Period." (SPD at 6.)

Specifically, "[i]f you return to work for 30 days or less during your Elimination Period, those days will count towards your Elimination Period. However, if you return to work for more than 30 days before satisfying your Elimination Period, you will have to begin a new Elimination Period. (SPD at 6.)

### c. Temporary Recovery

The Plan provides for a potential period of Temporary Recovery, defined as "your return to work for less than 6 months for each period of Temporary Recovery." (SPD at 6.) In particular, "[o]nce benefits become payable under This Plan, you may Temporarily Recover from your Disability. If you become Disabled again due to the same or related condition, you may not have to begin a new Elimination Period." (SPD at 14.)

### (3) Overpayments

The Plan provides that "[w]e have the right to recover from you any amount that we determine to be an Overpayment. You have the obligation to refund to us any such amount. Our rights and your obligations in this regard are also set forth in the reimbursement agreement you are required to sign when you become eligible for benefits under This Plan. . . . An Overpayment occurs when we determine that the total amount paid by us on your claim is more than the total of the benefits due under This Plan. This includes any Overpayments resulting from . . . retroactive award received from sources shown in the List of Other Income Benefits. . . ." (SPD at 20.) The List of Other Income Benefits includes benefits received under the Federal Social Security Act. (SPD at 10.)

### (4) The Short Term Disability Benefit Plan

MetLife also administers a Short Term Disability Benefit ("STD") Plan. The maximum benefit duration of the STD Plan is 26 weeks, which follows an Elimination Period of 14 days. (STD Plan at 2.)

The STD Plan also provides for Temporary Recovery. Specifically, "[o]nce you have satisfied your Elimination Period, a period of Temporary Recovery is your return to work for less than 14 consecutive days for each period of Temporary Recovery. If your recovery lasts longer than 14 days, when you become Disabled again you will have to begin a new Elimination Period." (STD Plan at 7.)

## B. Plaintiff's Disability

Aitkins began working as a blackjack dealer at the Caesar's Palace casino in Las Vegas in 1979. (Short Term Disability Eligibility Information (ML 0234).)

### (1) Plaintiff's STD Benefits

#### a. The First STD Claim

Aitkins received STD benefits from MetLife in connection with the period February 17, 2003 through July 27, 2003, stemming from a hospitalization for bipolar disorder on February 17, 2003. (*See* Physician Consultant Review, dated December 19, 2003 ("The Case Management Summary from the Case Manager indicates this individual has had several prior claims with the same diagnosis of bipolar disorder. The Claimant was out of work for several months in 2001 and again from 03/02/03 through 7/27/03. She had a prior inpatient hospitalization on 2/17/03 to 05/05/03.") (ML 0218).)[2] Aitkins returned to work on July 28, 2003.

#### b. The Second STD Claim

Aitkins also received STD benefits for bipolar disorder in connection with the period October 24, 2003 through April 11, 2004, stemming from plaintiff's stopping work on October 23, 2003. (Physician Consultant Review, dated May 13, 2004 (ML 0194).)[3]

A Diary Entry dated November 4, 2003 states: "relapse prior claim 02/18 to 7/27. . ."

_____

[2] Documents in possession of MetLife – such as Diary Entries and reports of MetLife physicians – contemporaneous with plaintiff's February-July 2003 STD Benefits are not part of the administrative record. However, plaintiff produced certain of these documents in conjunction with the instant motion. (*See, e.g.,* Pl.'s Exh. A, C.) In any event, the Court need not rely on these documents to determine whether the appeals process was full and fair because the administrative record demonstrates that MetLife failed to consider other documents Aitkins submitted during this process. Further, as discussed *infra*, MetLife should consider all documents plaintiff submits in support of her claim on remand, even if these documents were not originally part of the administrative record in this case.

[3] Plaintiff has produced documents related to various problems she had at work during the period between her two STD claims. (*See, e.g.,* Pl.'s Exhs. E, F.) Again, although these documents are not part of the administrative record, the Court need not rely on these documents to determine whether the appeals process was full and fair because the administrative record demonstrates that MetLife failed to consider other documents Aitkins submitted during this process.

(Diary Entries at 2 (ML 0066).) Another Diary Entry from that day states "possible recurrent claim." (Diary Entries at 3 (ML 0067).) However, a Diary Entry dated November 13, 2003 recounts a "CM['s]" conversation with Casillas in which the CM informed her "that the claim is recurrent only if presented within 14 days of the prior claim." (Diary Entries at 3 (ML 0067).)

During an investigation related to plaintiff's second STD claim, MetLife received statements from Aitkins's treating psychiatrist, Dr. Robert Peprah ("Dr. Peprah"). For instance, in April 2004, Dr. Peprah diagnosed plaintiff with bipolar disorder with symptoms including depression, confusion, and delusions. (Attending Physician Supplementary Statement, dated April 16, 2004 (ML 0215).) Also in April 2004, Dr. Peprah assigned Aitkins a Global Assessment of Functioning Scale ("GAF") score of 50. (Mental/Behavioral Functioning Assessment (ML 0206).) Dr. Peprah stated that plaintiff was "permanently disabled" and could not return to work as a blackjack dealer. (Mental/Behavioral Functioning Assessment (ML 0209-210).)

1. Dr. Busch's 2004 Report

In addition, in conjunction with plaintiff's second STD claim, MetLife had Aitkins's file reviewed by an independent physician consultant, Kenneth Busch M.D. ("Dr. Busch"), a Board-certified psychiatrist. In a report in May 2004, Dr. Busch stated: "The medical information indicates this individual has been hospitalized psychiatrically two times during the year 2003. There was a psychiatric admission the early part of 2003 and another admission 10/30 to 11/08/03." (Physician Consultant Review (ML 0194).)

In his report, Dr. Busch found that plaintiff was "in appropriate care and treatment for her diagnosis." (Physician Consultant Review (ML 0196).) Specifically, Dr. Busch stated:

The Claimant was seeing Dr. Peprah through January 2004 at which time it appears Dr. Peprah recommended that she move to New York City to be with her daughter so the daughter could provide the necessary support. Dr. Peprah indicated in January 2004 that this individual was not able to care for herself. She remained psychotic. It appears the Claimant did benefit from the move to New York City and that her daughter has been supportive. The Claimant did not find a doctor in the New York City area due to the fact that she wanted to continue under Dr. Peprah's care. Although there was some question regarding emergency treatment, the fact the Claimant was continuing with the medication, specifically mood stabilizers and antidepressant medication was the primary plan regarding her treatment. It appears the Claimant continued to take the medication which was supervised by her daughter and when she went back to see Dr. Peprah in April 2004 her Global Assessment of Function was improving. Hence, the care and treatment was appropriate for the diagnosis of bipolar disorder

and she was cooperating with the overall treatment plan.

(Physician Consultant Review (ML 0196).)

With respect to Dr. Busch's recommendations for plaintiff's STD claim, he stated that "the updated medical information from Dr. Peprah from mid April 2004 indicates that this individual continues to suffer from significant and functional psychiatric impairments that would preclude the Claimant from concentrating on her job responsibilities as a 21 Card Dealer for Cesar's [sic] Entertainment thorough the max out date 05/12/04." (Physician Consultant Review (ML 0196).)

(2) Aitkins Receives LTD Benefits

On June 10, 2004, having satisfied the Elimination Period, plaintiff applied for LTD benefits. (Long Term Disability Claim Form Employee Statement (ML 0270).) In his Long Term Disability Claim Form Attending Physician Statement, dated June 18, 2004 and supplied in conjunction with Aitkins's application, Dr. Peprah recommended that plaintiff "continue with medications" and "supportive psychotherapy." (Long Term Disability Claim Form Attending Physician Statement (ML 0161).) He stated that she had "significant cognitive difficulties" and was "disabled total." (Long Term Disablty Claim Form Attending Physician Statement (ML 0162).)

By letter dated May 21, 2004, MetLife informed Aitkins that her LTD claim had been approved for the period beginning April 27, 2004. (Letter from MetLife dated May, 21, 2004 (ML 0198).)

(3) Information MetLife Received During the Course of Plaintiff's LTD Benefit Period

a. Initial Social Security Denial

In October 2004, MetLife received a report from the Social Security Administration denying Aitkins's claim for benefits because her "condition is not severe enough to keep you from working." (Explanation of Determination, dated October 19, 2004 (ML 0151).)

b. Robinette Report

In March 2005, MetLife's nurse consultant, Joann Robinette ("Robinette"), wrote a report regarding the status of plaintiff's LTD claim. Robinette stated as a threshold matter that her findings were based on "very limited medical information." (Diary Detail dated April 6, 2005 (ML 0134).)

With respect to Aitkins's treatment, Robinette stated:

> There is nothing to review to show the level of impairment. The symptoms submitted by unknown treater are subjective in nature and there has been no diagnostic testing done to support this claims [sic] of cognitive impairment. This associate isn't been [sic] treated on a regular basis (7/04 and 2/05) are the last two office visits. This associate was told over a year ago about seeking treatment w/ a NY provider. Her daughter is a social worker and could possible [sic] assist w/ finding a provider that could see her either "pro bono" or on a sliding scale.

(Diary Detail dated April 6, 2005 (ML 0134).)

Robinette concluded:

> Recommendation: Based on the limited medical information . . . there is nothing to support her inability to return to work in her "own occupation" . . . there is no evidence of being under regular treatment, no office notes for review, no compliance with seeking treatment with a provider in NY as advised in 2/04. The one page for review doesn't not [sic] support her claim of total disability.

(Diary Entry dated April 6, 2005 (ML 0135).)

### (3) LTD Benefit Termination

By letter dated April 13, 2005 (the "Determination Letter"), MetLife informed Aitkins that her LTD benefits were terminated as of March 27, 2005. (Determination Letter (ML 0131).) MetLife explained the termination:

> A complete and thorough review of all information submitted for your claim has been conducted. There is no information that shows the level of impairment. The symptoms submitted are subjective in nature and there has been no diagnostic testing done to support the claim of cognitive impairment. There is no documentation that you are receiving treatment on a regular basis. There is no evidence showing your condition is not controlled by medications.

> Based on the limited medical information received, there is nothing to support your inability to return to work in your Own Occupation.

(Determination Letter (ML 0132.)

Further, MetLife explained the appeals process to Aitkins:

> Please include in your appeal letter the reason(s) you believe the claim was improperly denied, and submit any additional comments, documents, records or other information relating to your claim that you deem appropriate for us to give your appeal proper consideration.

(Determination Letter (ML 0131).)

### (4) The Appeal Process

#### a. Aitkins Appeals the Termination

By letter dated October 7, 2005 (the "Appeal Letter"), Casillas appealed the termination of her mother's benefits on her mother's behalf. (Appeal Letter (ML 0130).)

Casillas explained that she had obtained various documents in support of the appeal:

> I have several office notes from her psychiatrist Dr. Peprah, as well as a letter from him stating he does not believe she is able to return to work at this time. You also strongly recommended that I obtain some type of objective

assessment of my mother's disability. . . . It took me until last month to obtain copies of her cognitive testing she had done after being referred to social security. Dr. Peprah has a copy of this objective assessment, and is currently writing up an evaluation incorporating observations of my mother with the cognitive testing.

(Appeal Letter (ML 0130).)

### b. Plaintiff's and Dr. Peprah's Communications With MetLife During the Appeal Process

Set forth below is the chronology contained in the administrative record of Casillas's and Dr. Peprah's correspondence with MetLife during plaintiff's appeal process.

### 1. Dr. Peprah's May 2005 Findings

Casillas sent MetLife a letter from Dr. Peprah, dated May 12, 2005. In the letter, Dr. Peprah stated: "My patient tells me that her disability has been terminated. In my opinion, she is not able to return to work. She is organized in doing only the simplest of tasks. . . . It is clear that her Bipolar illness has deteriorated over time." (Letter from Dr. Peprah, dated May 12, 2005 (ML 0129).)

### 2. Dr. Peprah's October 2005 Findings and Related Test Results

In further support of plaintiff's appeal, Casillas sent MetLife an additional letter from Dr. Peprah, dated October 10, 2005. In the letter, Dr. Peprah stated: "Ms. Aitkins underwent psychological testing recently. It revealed a performance IQ of 70. This confirms

to me the deterioration over time. For years she was a competent Black Jack dealer. She cannot return to work. In fact when she was returned to work after her last hospitalization she was sent home several times." (Letter from Dr. Peprah, dated October 10, 2005 (ML 0129).)

Casillas also submitted the test results to which Dr. Peprah referred in his letter. Specifically, she submitted the results of Aitkins's "WAIS-III" test, dated September 24, 2004. The results placed Aitkins in the "low average range of cognitive functioning," and further stated:

> This claimant appears capable of the following vocational functions from the psychological/ psychiatric perspective: Following and understanding simple directions and instructions, performing simple tasks independently, maintaining attention and concentration, maintaining a regular schedule, learning new tasks, and relating adequately with others. She may have difficulty appropriately dealing with stress and consistently making appropriate decisions. Her ability to perform complex tasks would be contingent upon her familiarity with those tasks and at this point she may need supervision in those tasks.

(WAIS-III Test Results (ML 0125).)

### 3. Evidence of New Manic Episode

By letter dated October 14, 2005, Casillas wrote to the Appeals Committee, stating:

> I am writing to inform you that I will be sending one additional piece of information, hopefully by the end of next week. My mother unfortunately seems to be phasing back in to another manic episode. She is going to Dr. Peprah this Monday, October 17th, so he can make an assessment. I will obtain his office note as soon as possible. . . .

(Letter to Appeals Committee, dated October 14, 2005 (ML 0121).)

### 4. Letter Regarding Scope of Appeal

By letter to MetLife's Appeals Committee dated October 25, 2005, Casillas wrote:

> I am concerned that the cognitive testing completed will not meet your requirements due to it occurring before March. During my conversation with a customer service agent from your company this past Friday, I was made aware that you are looking for information about my mother's condition solely during the period from March through October. On the other hand, when I spoke to Mr. Oswald several times about the importance of you receiving objective measures, such as cognitive testing, he never apprised me that the testing needed to occur within that time frame. Instead I told him I was working on obtaining testing she had done during the end of last year – the only thing he emphasized was to try and get that information, OR to have other testing done. I did obtain those results, which Dr. Peprah, her psychiatrist, included in an office note. If she needs more current testing I ask that we please be able to do that now as I was not made aware of the time frame previously.

(Letter to Appeals Committee, dated October 25, 2005 (ML 0119).)

Casillas also noted the following regarding plaintiff's condition: "My mother is currently experiencing another manic episode. I have enclosed the most recent office note from Dr. Peprah noting such symptoms. His handwriting is difficult to read. . . ." (Letter to Appeals Committee, dated October 25, 2005 (ML 0119).) Although the appended Progress Note from Dr. Peprah is, indeed, difficult to read, it appears to state – in part – that "the p[atien]t has decompensated. . . ." (Progress Note, dated October 17, 2005 (ML 0120).)

### 5. Evidence Regarding Hospitalization

By letter dated November 1, 2005, Casillas provided MetLife with plaintiff's "discharge summary sheet given to her after her release this weekend from the Comprehensive Psychiatric Emergency Program at Stony Brook University Hospital. Due to her mania and delusion, the doctors kept her there from Friday until Sunday. There will be a follow-up visit with a local psychiatrist very soon. I will send that

paperwork when I receive it. *Can someone please call me as to whether or not I need to obtain a current cognitive evaluation?*" (Letter to Appeals Committee, dated November 1, 2005 (ML 0116)) (emphasis in original.)

c. The Kessler Report

In reviewing Aitkins's appeal, MetLife obtained an evaluation by Independent Physician Consultant Leonard Kessler, M.D. ("Dr. Kessler"), a Board-certified psychiatrist. Dr. Kessler stated that he reviewed the following documents in evaluating Aitkins's appeal: (1) "Activities of Daily Living Form dated 3/15/03"; (2) "Functional Assessment Form by Luis Carols Ortega, MD, former treating psychiatrist, dated 3/18/03"; (3) "Progress Notes by Dr. Ortega, dated 4/12/01, 4/17/01, 5/2/01 and 3/11/03"; (4) "Letters by Robert Peprah, MD, recent treating psychiatrist, dated 1/20/04, 5/12/05, and 10/14/05"; (5) "APS by Dr. Peprah, dated 2/11/05"; (6) Progress note by Dr. Peprah, dated 2/11/05"; (7) Letters by Katherine Casillas, daughter of the claimant, dated 10/7/05, 10/10/05, and 10/14/05"; (8) "Page three of a psychological evaluation by Paul Herman, Ph.D, dated 9/24/04"; and (9) "Letter by Mary Glovinsky, Ph.D, dated 11/28/01". (Report of Dr. Kessler, dated October 25, 2005 (the "Kessler Report") (ML 0111).) Of these documents, the "Activities of Daily Living Form, dated 3/15/03," the "Functional Assessment Form by Luis Carols Ortega, MD, former treating psychiatrist, dated 3/18/03," the "Progress Notes by Dr. Ortega, dated 4/12/01, 4/17/01, 5/2/01 and 3/11/03," and the "Letter by Mary Glovinsky, Ph.D, dated 11/28/01" do not appear in Aitkins's claim file, *i.e.,* in the administrative record MetLife reviewed prior to issuing the determination letter.

After reviewing these documents, Dr. Kessler made the following conclusions in his report, dated October 25, 2005:

> 1) The claimant has not shown treatment documentation over the last year aside from a treatment note of 2/11/05, with no evidence of any form of relevant therapy. Her treatment is, thus, considered to be incomplete, and inappropriate, lacking an intensity consistent with the presence of a severe disorder.
> 2) The medical documentation provided has not shown the presence of a severe psychiatric disorder from 3/26/05, for which appropriate treatment was provided, and which resulted in marked and sustained functional limitations.
> 3) Although Dr. Peprah has reported difficulties with memory and concentration he has failed to provide any recent objective documentation to show such deficits nor the resultant impact upon functional abilities. Although Dr. Herman had reported low average intellectual abilities it is not known that this reflects any deterioration in function or a continuation of her prior level of function.

(Kessler Report (ML 0112).)

1. MetLife Communications Regarding Information Sent to Dr. Kessler

A MetLife Diary Entry dated October 26, 2005 pertains to the information Casillas provided in her letter of October 25, 2005, discussed *supra*, in which Casillas stated her concerns about the scope of the appeal and noted that her mother was decompensating. In particular, the Diary Entry states: "Info rec'd 10/26 is a letter from ee dau. In f/u to my telephone conver w/ her where I indicated we needed info from 3/05-10/05 and she wasn't ware [sic] of that. Said she wants to send in current meds. Also rec'd is an ovn from 10/6 stating ee has decompensated. Since this is current and not for the period in question, I w/n be forwarding to the IPC for review." (Diary Entry, dated October 26, 2005 (ML 0097).)

Another Diary Entry, dated November 11, 2005, appears to relate to Casillas's letter dated November 1, 2005 regarding plaintiff's hospitalization. This Entry states: "Info rec'd is pertaining to ee's current condition and is not relevent [sic] to the time period in question, beyond 3/26/05 term dte." (Diary Entry, dated November 11, 2005 (ML 0097).)

d. The Termination of Benefits is Upheld

By letter to Aitkins dated November 21, 2008 (the "appeal denial letter"), MetLife upheld its termination of her LTD benefits. In particular, MetLife concluded, *inter alia*:

> In summary, you have not shown treatment documentation over the last year aside from a treatment note of February 11, 2005, with no evidence of any form of relevant therapy. Your treatment is, thus, considered to be incomplete, and inappropriate, lacking an intensity consistent with the presence of a severe disorder. We did receive documentation of your current condition, however, the medical documentation provided has not shown the presence of a severe psychiatric disorder from March 26, 2005. . . .
> In conclusion, although you may be experiencing difficulties at the current time that may not allow you to return to work, there is no medical evidence on file from the time your claim was terminated, March 26, 2005 through present, that would support your inability to perform your job. Therefore, we find our original decision is appropriate and no additional benefits are payable.

(Appeal Denial Letter (ML 0109).)

(5) Social Security Benefit Approval

By letter dated October 21, 2006, the Social Security Administration approved Aitkins's claim for Social Security benefits. In particular, the Social Security Administration found that plaintiff was disabled and entitled to benefits as of February 17, 2003. (Letter from Social Security Administration, dated October 21, 2006, at 1.)

With respect to the question of reimbursement under the Plan, Aitkins had signed an Agreement to Reimburse Overpayment of Long Term Disability Benefits ("Reimbursement Agreement") on

June 10, 2004, and Casillas served as the witness. (Reimbursement Agreement (ML 0171).) The agreement provides: "I agree to repay MetLife in a single lump sum any overpayment on my Long Term Disability claim due to integration of retroactive Social Security Benefits." (Reimbursement Agreement (ML 0171).) To date, Aitkins has not reimbursed MetLife for any Social Security Disability benefits she has received.

### (6) Correspondence Regarding Retroactive Adjustment of Disability Start Date

By letter dated December 20, 2006, plaintiff's counsel wrote to defendants' counsel proposing that MetLife retroactively adjust the starting date of plaintiff's LTD benefits from October 23, 2003 to February 17, 2003. Counsel provided two reasons for this adjustment. First, counsel argued that the Social Security Administration's letter dated October 21, 2006, mentioned *supra*, "sets forth a compelling case that the plaintiff initially became disabled as a result of her bipolar disorder on February 17, 2003." (Pl.'s Exh. L at 1.) Second, counsel argues that the Plan

> expressly provides that a return to work for 30 days or less during the Elimination Period will not necessitate a new Elimination Period. In this case, Ms. Aitkins resumed working on July 28, 2003; less than 30 days before the completion of her revised Elimination Period on August 17, 2003. The fact that Ms. Aitkins may have been working during the initial period for which benefits were otherwise payable, i.e., from August 28, 2006 to October 23, 2003 does not warrant denial of the requested adjustment. The

> [Plan], under the section entitled "Temporary Recovery" expressly provides that a return to work for a period of less than six months, similarly, will not necessitate the commencement of a new Elimination Period.

(Pl.'s Exh. L at 2.) Counsel also noted that although Casillas asked MetLife whether the second STD claim was a recurrence of the first STD claim, as discussed *supra*, the administrative file does not indicate that MetLife expressly decided that issue. (Pl.'s Exh. L at 2.)

Further, by letter dated July 6, 2007, Aitkins's counsel formally filed an "appeal" to MetLife regarding the retroactive adjustment issue. (Pl.'s Exh. 0.) By letter to plaintiff's counsel dated July 27, 2007, MetLife stated: "The November 21, 2005 determination constituted completion of the full and fair review required by the Plan and federal law. Accordingly, your client has exhausted the Plan's administrative remedies, we are unable to consider information that was not in our possession during the administrative review of your client's claim and no further appeals will be considered." (Pl.'s Exh. P.)

### II. PROCEDURAL HISTORY

Plaintiff filed the initial complaint in this action on September 6, 2006, and an amended complaint on January 15, 2007. Defendants filed their answer and counterclaim on January 15, 2007. Defendants filed their motion for summary judgment on July 27, 2007. Plaintiff filed her opposition and cross-motion on September 4, 2007. Defendants filed a reply

brief and their opposition to plaintiff's motion on October 2, 2007. Plaintiff filed a reply brief and her opposition to defendants' cross-motion on October 16, 2007. The Court held oral argument on November 13, 2007.

### III. STANDARD OF REVIEW

#### A. Summary Judgment

The standards for summary judgment are well settled. Pursuant to Federal Rule of Civil Procedure 56©, a court may not grant a motion for summary judgment unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56©; *Globecon Group, LLC v. Hartford Fire Ins. Co.*, 434 F.3d 165, 170 (2d Cir. 2006). The moving party bears the burden of showing that he or she is entitled to summary judgment. *See Huminski v. Corsones*, 396 F.3d 53, 69 (2d Cir. 2004). The court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir. 2004); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (holding that summary judgment is unwarranted if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

Once the moving party has met its burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . [T]he nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial*." *Caldarola v. Calabrese,* 298 F.3d 156, 160 (2d Cir. 2002) (quoting *Matsushita Elec. Indus. Co.*

*v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)). As the Supreme Court stated in *Anderson*, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted). Indeed, "the mere existence of *some* alleged factual dispute between the parties" alone will not defeat a properly supported motion for summary judgment. *Id.* at 247-48. Thus, the nonmoving party may not rest upon mere conclusory allegations or denials, but must set forth "concrete particulars" showing that a trial is needed. *R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 77 (2d Cir. 1984) (internal quotations omitted); *Tufariello v. Long Island R.R.*, 364 F. Supp. 2d 252, 256 (E.D.N.Y. 2005). Accordingly, it is insufficient for a party opposing summary judgment "merely to assert a conclusion without supplying supporting arguments or facts." *BellSouth Telecomms., Inc. v. W.R. Grace & Co.*, 77 F.3d 603, 615 (2d Cir. 1996) (internal quotations omitted).

#### B. Benefit Determinations Under ERISA

A denial of benefits under ERISA "'is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan.'" *Krauss v. Oxford Health Plans, Inc.*, No. 06-0343, 2008 U.S. App. LEXIS 4083, at *17 (2d Cir. Feb. 26, 2008) (quoting *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)). "If the insurer establishes that it has such discretion, the benefits decision is reviewed under [an] arbitrary and capricious standard." *Krauss*, 2008 U.S. App. LEXIS 4083, at *17; *see also Celardo v. GNY Automobile Dealers Health & Welfare Trust*, 318 F.3d 142, 145 (2d Cir.

2003) ("The Supreme Court . . . has indicated that plans investing the administrator with broad discretionary authority to determine eligibility are reviewed under the arbitrary and capricious standard."). Here, as neither party disputes, the Plan explicitly affords MetLife such discretionary authority. Therefore, the Court will apply the arbitrary and capricious standard both in reviewing MetLife's initial decision to terminate Aitkins's benefits as well as the appellate process MetLife provided plaintiff.[4] *See Zervos v. Verizon New York, Inc.*, 277 F.3d 635, 647-48 (2d Cir. 2002) (affirming district court's holding that insurer's appellate process was "arbitrary and capricious"); *see also Marasco v. Bridgestone/Firestone, Inc.*, No. 02-CV-6257, 2006 U.S. Dist. LEXIS 7583, at *13 (E.D.N.Y. Feb. 15, 2006) ("Under ERISA, a plan administrator must provide an employee whose claim for benefits has been denied with a 'full and fair review.' 29 U.S.C. § 1133(2). Failure to conduct a 'full and fair review' can be grounds for finding that a plan administrator's decision was arbitrary and capricious.'") (citing *Crocco v. Xerox Corp.*, 137 F.3d 105, 108 (2d Cir. 1998)).

In particular, according to the Second Circuit, an administrator's decision is arbitrary and capricious "if it was 'without reason, unsupported by substantial evidence or erroneous as a matter of law.'" *Krauss*, 2008 U.S. App. LEXIS 4083 (quoting *Fay v. Oxford Health Plan*, 287 F.3d 96, 104 (2d Cir. 2002)). In particular,"[s]ubstantial evidence is 'such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the [administrator and] . . . requires more than a scintilla but less than a preponderance.'"

*Celardo*, 318 F.3d at 146 (quoting *Millerv. United Welfare Fund*, 72 F.3d 1066, 1072 (2d Cir. 1995)).

Thus, [u]nder the arbitrary and capricious standard, the scope of judicial review is narrow." *Celardo*, 318 F.3d at 146; *see also Miller*, 72 F.3d at 1070 ("When an employee benefit plan grants a plan fiduciary discretionary authority to construe the terms of the plan, a district court must review deferentially a denial of benefits. . . ."); *Lee v. Aetna Life and Casualty Insurance Co.*, No. 05 Civ. 2960, 2007 U.S. Dist. LEXIS 38205, at *12 (S.D.N.Y. May 24, 2007) ("Under the arbitrary and capricious standard of review, Aetna's decision to terminate benefits is entitled to deference. . . ."); *Butler v. N.Y. Times Co.*, No. 03 Civ. 5978, 2007 U.S. Dist. LEXIS 18400, at *8-*9 (S.D.N.Y. Mar. 7, 2007) ("Under the 'arbitrary and capricious' standard the scope of review is a narrow one. A reviewing court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.'") (quoting *Bowman Transp. Inc. v. Ark. Best Freight Sys.*, 419 U.S. 281, 285 (1974)); *Greenberg v. Unum Life Insurance Co. of America*, No. CV-03-1396, 2006 U.S. Dist. LEXIS 22423, at *26-*27 (E.D.N.Y. Mar. 27, 2006) ("Decisions of the plan administrator are accorded great deference: the court may not upset a reasonable interpretation by the administrator. . . . Accordingly, it is inappropriate in this setting for the trial judge to substitute his judgment for that of the plan administrator.") (citations and quotation marks omitted).

(1) Role of Administrative Record

"The legal standard for considering evidence outside the administrative record depends on the standard of review to be

---

[4] Although Aitkins argues that her claim for retroactive adjustment of her disability start date is entitled to *de novo* review, the Court rejects that argument for the reasons discussed *infra*.

applied to the claim. For a de novo review of the administrator's decision, 'the district court ought not to accept additional evidence absent good cause.' [*Zervos*, 277 F.3d at 646.] For a review under the 'arbitrary and capricious' standard, however, 'a district court's review . . . is limited to the administrative record. *Miller*, 72 F.3d at 1071." *Parisi v. Unumprovident Corp.*, No. 3:03CV01425, 2007 U.S. Dist. LEXIS 93472, at *23-*24 (D. Conn. Dec. 21, 2007); *see Miller*, 72 F.3d at 1071 ("We follow the majority of our sister circuits in concluding that a district court's review under the arbitrary and capricious standard is limited to the administrative record."); *Fitzpatrick v. Bayer Corp.*, No. 04 Civ. 5134, 2008 U.S. Dist. LEXIS 3532, at *25-*26 (S.D.N.Y. Jan. 17, 2008) ("In assessing whether the decision of the administrator was reasonable, the court may not consider extrinsic matters but must remain within the bounds of the administrative record considered by the plan's decision-maker.") (citation and quotation marks omitted); *Leccese v. Metropolitan Life Insurance Co.*, No. 05-CV-6345, 2007 U.S. Dist. LEXIS 27194, at *15 (W.D.N.Y. Apr. 12, 2007) ("The Second Circuit has considered whether a district court should consider evidence that was not before the plan administrator and held that additional evidence may be considered upon *de novo* review of an issue of plan interpretation. However, since the parties agree that the standard of review in this case is arbitrary and capricious, the Court is limited to a review of the record as it existed before the plan administrator.") (citations and quotation marks omitted); *Nelson v. Unum Life Ins. Co. of Am.*, 421 F. Supp. 2d 558, 572 (E.D.N.Y. 2006), *aff'd*, 2007 U.S. App. LEXIS 8863 (2d Cir. 2007) ("Thus, in determining whether Unum's denial of benefits was arbitrary and capricious, it is proper to consider nothing more and nothing less than the administrative record."); *Gaboriault v. Int'l Business Machines Corp.*, No. 1:05CV91, 2006 U.S. Dist. LEXIS 82787, at *2-*3 (D. Vt. Nov. 13, 2006) ("Where

a plan grants the plan fiduciary such discretionary authority, the Court is required to limit its review of a denial of benefits to the administrative record. . . ."). Therefore, in analyzing whether MetLife's decisions were arbitrary and capricious, the Court has confined its review to the administrative record.

## IV. DISCUSSION

### A. The Initial Decision to Terminate Benefits

In support of her motion for summary judgment, Aitkins argues that MetLife's initial decision to terminate her benefits was arbitrary and capricious. However, for the reasons described below, the Court finds that MetLife's initial decision to terminate benefits was not arbitrary and capricious and was based on substantial evidence. Thus, the Court will not grant summary judgment to plaintiff on this ground.

#### (1) Burden of Proof

Under Second Circuit law, plaintiff "has the burden of proving by a preponderance of the evidence that [s]he is totally disabled within the meaning of the plan." *Paese v. Hartford Life and Accident Insurance Co.*, 449 F.3d 435, 441 (2d Cir. 2006) (citation and quotation marks omitted); *see also Vormwald v. Liberty Mutual Life Assurance Co. of Boston*, No. 5:05-CV-671, 2007 U.S. Dist. LEXIS 62631, at *10 (N.D.N.Y. Aug. 23, 2007) ("The claimant has the burden of proving by a preponderance of the evidence that she is disabled in accordance with the plan's terms."); *Graham v. First Reliance Standard Life Insurance Co.*, No. 04 Civ. 9797, 2007 U.S. Dist. LEXIS 55324, at *3 (S.D.N.Y. July 31, 2007) ("Plaintiff bears the burden of proving that he is totally disabled

within the meaning of the plan by a preponderance of the evidence"); *Alexander v. Winthrop, Stimson, Putnam and Roberts Long Term Disability Coverage*, 497 F. Supp. 2d 429, 434 (E.D.N.Y. 2007) ("Plaintiff bears the burden of proving her entitlement to benefits.").

Thus, as a threshold matter, the Court rejects Aitkins's argument that MetLife's decision to terminate benefits was arbitrary and capricious because: (1) plaintiff had previously received STD benefits; (2) the administrative record contained evidence from 2003 and 2004 showing that she was previously disabled; and (3) the frequency of plaintiff's doctor visits did not change over time. "To the extent that Plaintiff argues that the past payment of benefits resulted in a shifting of the burden to the Defendants . . . Plaintiff is incorrect. There is nothing in the caselaw suggesting that the burden of proof shifts to the Defendants if the Plaintiff previously received benefits." *Fitzpatrick v. Bayer Corp.*, No. 04 Civ. 5134, 2008 U.S. Dist. LEXIS 3532, at *27-*28 (S.D.N.Y. Jan. 17, 2008) (citing *Paese*, 449 F.3d at 441); *see also Graham v. First Reliance Standard Life Insurance Co.*, No. 04 Civ. 9797, 2007 U.S. Dist. LEXIS 55324, at *3 (S.D.N.Y. July 31, 2007) ("While the standards for STD and LTD are similar, we do not conclude that First Reliance's willingness to pay STD benefits precludes it from reassessing that position when an application for LTD is made."); *Lee v. Aetna Life and Casualty Insurance Co.*, No. 05 Civ. 2960, 2007 U.S. Dist. LEXIS 38205, at *12-*13 (S.D.N.Y. May 24, 2007) ("Aetna is not required to disprove the possibility that Lee was disabled in order to terminate her benefits; rather, it is Lee's burden to demonstrate her disability under the Plan."); *Butler v. New York Times Co.*, No. 03 Civ. 5978, 2007 U.S. Dist. LEXIS 18400, at *11-*12 (S.D.N.Y. Mar. 7, 2007) ("Plaintiff maintains, in part, that Defendant's denial of benefits is arbitrary and capricious because her condition had not

improved subsequent to her ceasing work in April 1998 or receiving approval of benefits in December 1998. . . . This is not the correct inquiry. . . . Whether Plaintiff can satisfy [the Plan's definition of disabled] after April 2000 – not whether her condition has improved – determines her eligibility for benefits."). Thus, the Court is mindful of Aitkins's burden to demonstrate her continued disability in considering whether MetLife's decision was arbitrary and capricious.[5]

(2) The Basis for MetLife's Determination

As described *supra*, the determination letter set forth the reasons why MetLife terminated Aitkins's LTD benefits:

> A complete and thorough review of all information submitted for your claim has been conducted. There is no information that shows the level of impairment. The symptoms submitted are subjective in nature and there has been no diagnostic testing done to support the claim of cognitive impairment. There

---

[5] Further, the Court notes that to the extent the evidence of Aitkins's past disability is not in the administrative record, the Court will not consider this evidence in evaluating MetLife's decision, for the reasons stated *supra*. Similarly, the Court will not take into account plaintiff's award of Social Security benefits in determining whether MetLife's decision to terminate benefits was arbitrary and capricious. This award came after MetLife denied Aitkins's appeal and, thus, is not part of the administrative record. However, as the Court discusses *infra*, MetLife should take this award into account in performing a full and fair review of plaintiff's appeal on remand.

is no documentation that you are receiving treatment on a regular basis. There is no evidence showing your condition is not controlled by medications.

The Court has carefully reviewed the administrative record, according to the narrow and deferential standard of review applicable here and maintaining the burden of proof on plaintiff, and concludes that MetLife's initial determination to terminate Aitkins's benefits was not arbitrary and capricious as a matter of law.

In particular, the Plan explicitly provides in the Benefits Checklist section:

> In order to receive benefits under This Plan, you must provide to us at your expense, and subject to our satisfaction, all of the following documents. . . .
>
> ✓    Proof of Disability
> ✓    Evidence of continuing Disability
> ✓    Proof that you are under the Appropriate Care and Treatment of a Doctor throughout your Disability. . . .
> ✓    Any other material information related to your Disability which may be requested by us.

(Plan at 3.) Despite these express obligations of plaintiff under the Plan, Aitkins had failed to provide up-to-date, objective medical information to MetLife prior to the initial determination to terminate benefits. Indeed, MetLife's commission of the Robinette Report, which describes this dearth in some detail,

belies any argument that MetLife's decision was arbitrary and capricious. *Cf. Miller*, 72 F.3d at 1072 ("We have no basis for concluding that the Trustees' decision rested on anything other than the three-sentence report. Reliance on such limited information to deny the claim was arbitrary and capricious since it was not based on a consideration of the relevant factors.") (citation and quotation marks omitted).

Further, as set forth below, the Court rejects the arguments Aitkins makes in an effort to undermine MetLife's decision. Specifically, the Court rejects plaintiff's objection to MetLife's requirement of "diagnostic testing" as "proof" of disability under the Plan, as opposed to the "subjective" evidence of disability reflected in the progress reports provided to MetLife by Dr. Peprah, and enumerated by plaintiff in her moving papers. (Pl.'s Mem. at 20.)

With respect to the requirement of objective evidence, "[t]he Second Circuit has not squarely addressed this issue. However, several courts in this district have found that it is not unreasonable or arbitrary for a plan administrator to require the plaintiff to produce objective medical evidence of total disability in a claim for disability benefits." *Fitzpatrick*, 2008 U.S. Dist. LEXIS 3532, at *32-*33 (collecting cases); *see also Fedderwitz v. Metropolitan Life Insurance Co., Inc.'s Disability Unit*, No. 05-CV-10193, 2007 U.S. Dist. LEXIS 72702, at *26 (S.D.N.Y. Sept. 27, 2007) ("[A]s a general matter, courts in this Circuit have declined to find unreasonable a decision to favor objective over subjective medical evidence."); *Graham v. First Reliance Standard Life Insurance Co.*, No. 04 Civ. 9797, 2007 U.S. Dist. LEXIS 55324, at *27 (S.D.N.Y. July 31, 2007) ("First Reliance's decision to credit objective evidence over

subjective evidence was not unreasonable or illegitimate."); *Parisi*, 2007 U.S. Dist. LEXIS 93472, at *28 ("[T]he very concept of proof connotes objectivity. . . . Thus, it is hardly unreasonable for the administrator to require an objective component to such proof.") (citations and quotation marks omitted); *Greenberg*, 2006 U.S. Dist. LEXIS 22423, at *36 ("An insurance company must be allowed to employ a system which will prevent awarding benefits to those whose symptoms are exaggerated or faked. As such, it is reasonable for the company to prefer objective verifiable evidence over the self-reported symptoms of the insured."). Here, the Court has carefully reviewed the administrative record – including the particular evidence to which plaintiff points – and has failed to find evidence of any objective evidence, such as diagnostic testing, performed in close proximity to the initial determination to terminate benefits. Thus, in keeping with other courts in the Second Circuit, the Court finds that MetLife's emphasis on the lack of current objective evidence in the administrative file was reasonable.[6]

---

[6] Relatedly, the Court rejects Aitkins's argument that MetLife's decision was arbitrary and capricious because MetLife had credited plaintiff's subjective complaints in originally granting her STD and LTD benefits. As a district court in this Circuit stated:

> On arbitrary and capricious review, the consideration of [complaints of pain], including credibility determinations, is within the discretion of the administrator. That Aetna *considered* Lee's subjective complaints as a basis for disability is evident from the fact that, based on those complaints alone, Aetna granted Lee long term disability benefits. . . . Aetna terminated benefits when, after a full review of all data, records and medical information, it determined that Lee's subjective complaints

In addition, the Court rejects plaintiff's argument that the lack of emphasis MetLife apparently placed on the reports Dr. Peprah provided rendered MetLife's decision arbitrary and capricious. The Court is aware that a plan administrator "may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." *Paese*, 449 F.3d at 442 (quoting *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003)). However, as courts within the Second Circuit have held, such a refusal is not arbitrary where the administrative record fails to support – with objective evidence – the treating physician's opinions. Indeed, a district court confronting plaintiff's very argument on this issue stated as follows, in an opinion affirmed by the Second Circuit:

> [T]he administrator, far from ignoring the reports of the treating physicians, heavily relied on the fact that none of them adduced any objective

---

> were not credible in light of the absence of any medical diagnosis or corroborating evidence. That determination was neither arbitrary nor capricious."

*Lee*, 2007 U.S. Dist. LEXIS 38205, at *16 (emphasis in original). The Court is aware that the instant case is distinguishable from *Lee* in that Aitkins did have a medical diagnosis at the time MetLife terminated her benefits. However, in light of plaintiff's burden of proof, discussed *supra*, the Court is persuaded by *Lee*'s broader point, *i.e.,* that an administrator's initial reliance on subjective complaints does not preclude the administrator from revoking benefits at a later date in light of a more fully developed record (or, as here, an undeveloped record).

evidence of plaintiff's complaints. In these circumstances, it was not unreasonable for the administrator to conclude that the only material reason the treating physicians were reaching their diagnoses was based on their acceptance of plaintiff's subjective complaints: an acceptance more or less required of treating physicians, but by no means required of the administrator. While plaintiff argues that the plan itself does not state that objective evidence is necessary to establish disability, the plan does state that "proof" of continued disability must be provided, and the very concept of proof connotes objectivity. In any event it is hardly unreasonable for the administrator to require an objective component to such proof.

*Maniatty v. Unumprovident Corp.*, 218 F. Supp. 2d 500, 504 (S.D.N.Y. 2002), aff'd, 2003 U.S. App. LEXIS 9383 (2d Cir. May 15, 2003). Thus, *Maniatty* stands for the proposition that an administrator may – as did MetLife here – reasonably discredit a treating physician's assessment of his patient, where the administrative record does not contain objective evidence that supports this assessment. *See Parisi*, 2007 U.S. Dist. LEXIS 93472, at *42-*43 ("Here, however, the court finds no reason to give the opinions of Parisi's treating physicians any special weight. Because there was no objective evidence of Parisi's symptoms, the medical assessments of Parisi's doctors were based solely on Parisi's subjective complaints of pain. Such assessments carry little weight in supporting disability claims, and

the plan administrator is not required to accept them."); *Fedderwitz*, 2007 U.S. Dist. LEXIS 72702, at *26 ("Fedderwitz also contends that MetLife's skepticism of some of Fedderwitz's physicians' subjective claims in the absence of objective medical documentation violated the terms of the Plan, by essentially adding new terms to the LTD Plan, to wit, an objective evidence requirement. This argument is unavailing. . . . . [T]he terms of the Plan expressly require 'satisfactory evidence' of a disability; it is not an unreasonable interpretation of that provision to require objective medical evidence to support subjective claims.") (citations and quotation marks omitted); *Vormwald*, 2007 U.S. Dist. LEXIS 62631, at *10 ("In reviewing the medical evidence, the administrator is not required to accord the treating physician's testimony any special deference; however, the administrator cannot arbitrarily refuse to credit reliable evidence from the treating physician."); *Badawy v. First Reliance Standard Life Insurance Co.*, No. 04 Civ. 01619, 2005 U.S. Dist. LEXIS 21868, at *30-*31 (S.D.N.Y. Sept. 29, 2005) ("The fact that at certain points Mr. Badawy's physicians considered his attacks to be more frequent or more incapacitating does not mean that First Reliance Standard's decisionmaking here was arbitrary and capricious when objective evidence could not support these conclusions. When viewed with a deferential eye, the lack of objective documentation that would sufficiently establish the severity and frequency of Mr. Badawy's attacks leads the Court to conclude that it was not arbitrary and capricious for First Reliance Standard to find that Mr. Badawy was not totally disabled. . . .") (citations omitted).

In any event, the Court notes that not all of Dr. Peprah's reports show Aitkins's continued disability. Indeed, Dr. Peprah

wrote a progress note regarding Aitkins on February 11, 2005 – approximately two months before the initial determination letter was issued – stating: "P[atien]t has been doing well. . . . She has been stable free of mood swings or manic behavior. She has also been free of psychosis. The patient hopes to get back to work." (Progress Note, dated February 11, 2005 (ML 0137).) This positive report from Dr. Peprah, in light of the lack of up-to-date objective evidence showing a continuing disability, squarely contradicts any argument that MetLife's initial decision to terminate benefits was arbitrary and capricious. *See Zdzienicki v. Consolidated Edison Co. of N.Y., Inc.*, No. 05 Civ. 3221, 2006 U.S. Dist. LEXIS 60895, at *21 (S.D.N.Y. Aug. 29, 2006) ("[T]he law is clear that a plan administrator's exercise of discretion involves the freedom to decide what evidence to credit or to discredit, and the mere existence of conflicting evidence does not render [an administrator's] decision arbitrary or capricious.") (citations and quotation marks omitted).

In sum, after careful review of the administrative record, and according MetLife a deferential standard of review, the Court concludes that MetLife's initial decision to terminate Aitkins's long term disability benefits was supported by substantial evidence and was not arbitrary or capricious as a matter of law. However, for the reasons set forth below, the Court finds that MetLife's failure to provide plaintiff a full and fair review during the appellate process was, in fact, arbitrary and capricious as a matter of law. *See Zervos*, 277 F.3d at 647 (agreeing with district court that appellate process was arbitrary and capricious in case where initial determination to deny benefits was unquestioned); *see also Cook v. New York Times Co. Group Long Term Disability Plan*, No. 02 Civ. 9154, 2004 U.S. Dist. LEXIS 1259, at *16-*17 (S.D.N.Y. Jan. 30, 2004) ("[T]he Administrator's

determination was indeed based on legitimate deficiencies in Cook's application and subsequent appeals. However, this alone does not resolve the case; those deficiencies were themselves in part a result of the Administrator's failure to afford Cook a fair review of her initial claim once it was denied. The outcome of the case thus hinges on a procedural matter: ERISA's requirement that plan administrators provide claimants with a full and fair appeals process that allows them a meaningful opportunity to correct any deficiencies in their claims.").

B. The Appellate Process

For the reasons set forth below, the Court finds that MetLife did not provide Aitkins a full and fair review of her claim during the appellate process and, thus, that this process was arbitrary and capricious as a matter of law.

(1) Legal Standard

As the Supreme Court and the Second Circuit have recognized, Section 1133 of ERISA explicitly requires employee benefit plans to "afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim." *Aetna Health Inc. v. Davila*, 542 U.S. 200, 220 (2004) (quoting 29 U.S.C. § 1133(2)); *see Krauss*, 2008 U.S. App. LEXIS at *41 n.10 ("Section 503(2) provides that 'every employee benefit plan shall . . . afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim.").

Similarly, both the Supreme Court and the Second Circuit have recognized that the

Department of Labor (the "DOL") has promulgated regulations pursuant to ERISA that set forth the particular procedures administrators must undertake in order to provide a full and fair review. *See Black & Decker Disability Plan*, 538 U.S. at 825 ("ERISA and the Secretary of Labor's regulations under the Act require 'full and fair' assessment of claims and clear communication to the claimant of the 'specific reasons' for benefit denials."); *Eastman Kodak Co. v. Coyne*, 452 F.3d 215, 221 (2d Cir. 2006) (holding that DOL regulation promulgated under ERISA "controls the outcome here").

In particular, these regulations state that in order to comply with ERISA's mandate of a full and fair review, plans providing disability benefits must:

> Provide claimants the opportunity to provide written comments, documents, records, and other information relating to the claim for benefits. . . [and] Provide for a review that takes into account all comments, documents, records, and other information submitted by the claimant relating to the claim, without regard to whether such information was submitted or considered in the initial benefit determination.

29 C.F.R. § 2560.503-1(h)(2)(ii)-(iii).

Courts within the Second Circuit have recognized, pursuant to ERISA and the regulations promulgated thereunder, that administrators fail to provide full and fair review to a claimant during the appellate process where the administrator does not clearly communicate the evidence required to "cure the defect in [the claimant's] application." *Cook*,

2004 U.S. Dist. LEXIS 1259, at *23 ("Neither the number of opportunities defendant gave her for her appeal nor the purported independence of its doctors is relevant to the issue of whether plaintiff was ever provided with information sufficient to afford her a meaningful opportunity to perfect her claim. A plan may provide a claimant with endless reviews by independent specialists, but unless the claimant is informed of the claim's defects, she is likely to be no better off than she was when she first applied."); *see also Fedderwitz*, 2007 U.S. Dist. LEXIS 72702, at *28 ("The purpose of [full and fair] review is to 'provide the member with information necessary for him or her to know what he or she must do to obtain the benefit . . . [and to] enable the member effectively to protest that decision.' In essence, the full and fair review requirement exists 'to provide claimants with enough information to prepare adequately for further administrative review or an appeal to the federal courts.'") (citation omitted) (quoting *Juliano v. Health Maintenance Org. of New Jersey*, 221 F.3d 279, 287 (2d Cir. 2000)); *Cohen v. Metropolitan Life Ins. Co.*, 485 F. Supp. 2d 339, 353 (S.D.N.Y. 2007) (finding that "MetLife's failure to comply with ERISA's full and fair review mandate rendered its decision arbitrary and capricious" in part because administrator's actions "clearly deprived Plaintiff of the opportunity to submit comments and materials relevant to MetLife's determination" and "when Cohen and her attorney did learn, after the appellate denial was issued, of the additional documentation and the conclusions MetLife had drawn from it, [the attorney] forwarded supplemental medical documentation and arguments to MetLife, which refused to consider them"); *Marasco*, 2006 U.S. Dist. LEXIS 7583, at *16 ("Because Firestone did not provide specific reasons for the denial or ways to

perfect his claim, there was no 'meaningful dialogue between [the] ERISA plan administrator[] and [its] beneficiary' as called for by ERISA.") (quoting *Juliano*, 221 F.3d at 287); *Anderson v. Sotheby's, Inc.*, No. 04 Civ. 8180, 2006 U.S. Dist. LEXIS 42539, at *73 (S.D.N.Y. June 21, 2006) ("At its core, the full and fair review requirement include[s] knowing what evidence the decision-maker relied upon, having an opportunity to address the accuracy and reliability of that evidence, and having the decision-maker consider the evidence presented by both parties prior to reaching and rendering his decision.") (citation and quotation marks omitted); *Cejaj v. Building Serv. 32B-J Health Fund*, No. 02 Civ. 6141, 2004 U.S. Dist. LEXIS 3401, at *21-*22 (S.D.N.Y. Mar. 5, 2004) ("The courts have defined a full and fair review to mean knowing what evidence the decision-maker relied upon, having an opportunity to address the accuracy and reliability of the evidence, and having the decision-maker consider the evidence presented by both parties prior to reaching and rendering his decision.") (citation and quotation marks omitted).

## (2) Application

Here, for the reasons set forth below, after careful review of the administrative record, the Court finds that MetLife's appellate process did not afford Aitkins a full and fair review under ERISA and, therefore, that this process was arbitrary and capricious. *See Zervos*, 277 F.3d at 648 ("adopt[ing] the district court's view that Empire's internal appellate process was arbitrary and capricious").

First, MetLife's communications with Casillas during the course of the appellate process wholly failed to convey to her the time period on which MetLife was focused, *i.e.,* whether MetLife required information that pre-or-post-dated the initial benefit termination, or both. As a threshold matter, the determination letter itself does not state the time period for which MetLife required additional evidence. Moreover, as described *supra*, Casillas's letters to MetLife dated October 25, 2005 and November 1, 2005 reflect that MetLife was providing inconsistent guidance to her regarding this required evidence. In the October 25, 2005 letter, for instance, Casillas recounts a telephone conversation with a MetLife representative who told her that she could either attempt to obtain pre-termination testing, or submit post-termination testing. In this letter, Casillas expressed concern because a customer service agent from MetLife had subsequently told her that the testing had to have taken place after the termination.[7] In the November 1, 2005 letter, Casillas emphatically asked MetLife: *Can someone please call me as to whether or not I need to obtain a current cognitive evaluation?*" Although the administrative record does not reflect that MetLife subsequently communicated to Casillas that such a current evaluation was necessary, Dr. Kessler based his recommendation to deny the appeal in part on the lack of "recent objective documentation" of plaintiff's disability. These communications, taken in the overall context of the appellate process in this case, demonstrate MetLife's failure to engage in a "meaningful dialogue" with Casillas regarding the evidence necessary to perfect her claim, even in the face of her repeated and pointed questioning. The Court finds that MetLife's denial of plaintiff's appeal based, in part, on evidence that Casillas did not know was necessary, deprived plaintiff of

---

[7] Aitkins appears to refer to a telephone conversation with MetLife that took place on October 21, 2005. (Diary Entry dated October 21, 2005 (ML 0096).)

a full and fair review under ERISA and was arbitrary and capricious as a matter of law.

Second, MetLife's failed to provide Dr. Kessler with evidence Casillas provided during the course of the appellate process regarding Aitkins's post-termination deterioration, and then relied on Dr. Kessler's recommendation that the appeal be denied based, in part, on the absence of post-termination evidence of disability. In particular, as the internal MetLife communications described *supra* reflect, MetLife chose not to provide Dr. Kessler with the information regarding Aitkins's decompensation and hospitalization contained, respectively, in Casillas's October 25, 2005 letter and November 1, 2005 letter, on the grounds that it was "not for the period in question" and was "beyond 3/26/05 term dte." However, MetLife then denied plaintiff's appeal based, in part, on Dr. Kessler's conclusion that the "medical documentation provided has not shown the presence of a severe psychiatric disorder from 3/26/05." This glaring inconsistency between the information forwarded to Dr. Kessler and the conclusions he drew in his report belies any conclusion that plaintiff received a full and fair review during the appellate process. *See Palmiotti*, 423 F. Supp. 2d at 302 (finding that plaintiff was deprived of a full and fair review in part because "there is also no indication that [administrator's independent physician reviewing appeal] or any other qualified medical expert, considered the significance of the additional subjective information and treatment notes pertaining to Palmiotti's daily life activities and the effect of his condition that Palmiotti submitted in connection with his appeal").[8]

Defendants do not directly address these procedural issues in their motion papers. Instead, defendants argue that because they "substantially complied" with ERISA's "procedural requirements," they afforded plaintiff a full and fair review. (Defs.' Opp. at 7.) As a threshold matter, it is unclear whether the Second Circuit has – as defendants claim – "adopted" the substantial compliance standard. (*Id.*) *See Nichols v. Prudential Ins. Co. of Am.*, 406 F.3d 98, 107 (2d Cir. 2006) (holding that application of "substantial compliance" standard "would render the plain language of Section 2560-503.1(h)(1) a nullity" but noting that "[i]t is true that many of our sister courts of appeal, in considering other requirements of Section 2560.503-1, in particular the notice of reasons for a denial and the right to appeal, have held that a plan administrator's decision made in substantial compliance with the regulation can be upheld"); *see also Marasco*, 2006 U.S. Dist. LEXIS 7583, at *15 n.3 ("Some circuit courts have held that 'substantial compliance' with ERISA regulations is sufficient, but the Second Circuit has not spoken on the issue at this time.") (citing *Nichols*, 406 F.3d at 107).

In any event, even assuming *arguendo* that the substantial compliance standard applies here, the Court finds that defendants fail to meet this standard under the

that preceded the time period reflected in this record. However, as stated *supra*, the DOL regulations explicitly provide that on appeal, the administrator may review material "without regard to whether such information was submitted or considered in the initial benefit determination." In any event, as discussed *infra*, Aitkins may provide additional material to MetLife from this earlier time period on remand, if she wishes.

---

[8] Plaintiff also objects to Dr. Kessler's review of material that was not part of the administrative record. Specifically, Dr. Kessler reviewed material

circumstances of this case. As a district court in this Circuit stated:

> Substantial compliance means that the beneficiary was supplied with a statement of reasons that, under the circumstances of the case, permitted a sufficiently clear understanding of the administrator's position to permit effective review. The existence of substantial compliance should be determined in light of the core requirements of a full and fair review, which include knowing what evidence the decision-maker relied upon, having an opportunity to address the accuracy and reliability of that evidence, and having the decision-maker consider the evidence presented by both parties prior to reaching and rendering his decision.

*Cook*, 2004 U.S. Dist. LEXIS 1259, at *21 (citations and quotation marks omitted). Here, for the reasons discussed *infra*, the Court finds that MetLife has not substantially complied with the applicable regulations. In particular, MetLife's conflicting communications with Casillas and with Dr. Kessler belie any inference of substantial compliance. Thus, defendants' argument fails even under the more relaxed standard they propose.

In sum, for the reasons stated above, based on a review limited to the administrative record, the Court finds that MetLife did not afford Aitkins a full and fair review during the appellate process and, thus, that this process was arbitrary and capricious as a matter of law.

(3) Remedy

For the reasons set forth below, the Court finds that the appropriate remedy for MetLife's failure to provide Aitkins a full and fair review during the appellate process is to remand this case to MetLife to conduct such a review.

A. Legal Standard

The Second Circuit has held that "[a] full and fair review concerns a beneficiary's procedural rights, for which the typical remedy is remand for further administrative review." *Krauss*, 2008 U.S. App. LEXIS 4083, at *41 (collecting cases). In contrast, where the Second Circuit finds that "a denial of benefits based on the record was unreasonable," remand is inappropriate. *Zervos*, 277 F.3d at 648 (citation and quotation marks omitted); *see also Rappa v. Connecticut General Life Ins. Co.*, No. 06-CV-2285, 2007 U.S. Dist. LEXIS 91094, at *36 (S.D.N.Y. Dec. 11, 2007) ("Where the decision to deny benefits is unreasonable because it was not based upon substantial evidence, as was the case here, reversal, rather than remand, is appropriate."). *Cf. Miller*, 72 F.3d at 1073 ("Although we find that the Trustees' decision was arbitrary and capricious, we do not conclude that Miller's claim necessarily should have been granted . . . . Therefore, we remand to the district court with the instruction that the case be returned to the Fund for reconsideration.").

In the specific context of summary judgment, therefore, district courts – rather than simply granting summary judgment and awarding benefits directly – will remand a case where the court cannot conclude, as a matter of law, that "a reasonable fiduciary could only have granted the claim." *Badawy*, 2005 U.S. Dist. LEXIS 21868 at *41

(granting plaintiff's summary judgment motion only "to the extent that defendant's determination is vacated" and remanding to administrator); *see also Shore v. Painewebber Long Term Disability Plan*, No. 04-CV-4152, 2007 U.S. Dist. LEXIS 77039, at *43-*44 (S.D.N.Y. Oct. 15, 2007) ("At this time, the Court is not prepared to find that Reliance is unwilling or unable to fairly evaluate Plaintiff's claim for benefits, and Plaintiff points to nothing in the record, other than Reliance's denial of her claim, that proves otherwise. Thus, while Plaintiff has made a persuasive case for benefits, the Court believes it would be inappropriate at this time to grant Plaintiff's Summary Judgment Motion. . . ."); *Robinson*, No. 05 Civ. 1534, 2006 U.S. Dist. LEXIS 29648, at *6-*7 (S.D.N.Y. May 12, 2006) ("Nevertheless, there is no basis for granting Ms. Robinson's claim and directing MetLife to provide her with long-term disability benefits. The record evidence is insufficient to compel the finding that a reasonable fiduciary must grant her claim. . . . Plaintiff's motion for summary judgment is granted to the extent that the case is remanded to MetLife for reconsideration. . . ."); *Dzidzovic v. Building Service 32B-J Health Fund*, No. 02-CV-6140, 2006 U.S. Dist. LEXIS 55546, at *31 (S.D.N.Y. Aug. 7, 2006) ("Plaintiff's motion for summary judgment is granted only to the extent of his claim for insufficient notice and failure to provide a 'full and fair review' as required by ERISA. The case is remanded to the Trustees for reconsideration of their decision in compliance with the procedural requirements of 29 U.S.C. § 1133."); *Nelson*, 421 F. Supp. 2d at 571 ("[T]he evidence is not so overwhelmingly one-sided that a reasonable person could only conclude that plaintiff's occupation was not sedentary. The proper remedy in this situation is not for the court to substitute its judgment for that of Unum, but to remand the case back to Unum with the instruction that it reconsider plaintiff's application and comply with the plan

language and the requirements of 29 U.S.C. § 1133 in issuing a new decision.").

Here, while the Court finds that MetLife's appellate procedures were arbitrary and capricious, the Court has carefully reviewed the administrative record and cannot conclude, as a matter of law, that MetLife was unreasonable in denying Aitkins's claim. Thus, the Court remands this case to MetLife to conduct a full and fair review of this claim, during which MetLife must clearly inform plaintiff of the evidence necessary to perfect it. Moreover, in compliance with ERISA and the DOL's regulations thereunder, Metlife – and, specifically, any physicians commissioned by MetLife to reevaluate this claim – must consider all of the evidence Aitkins provides. *See Miller*, 72 F.3d at 1074 ("Upon receipt of this case, the Fund should be given the opportunity to present conflicting or contradictory evidence to overcome [Miller's] evidence. Miller must then be permitted to produce any additional evidence to rebut any evidence on which the Fund could rely to deny benefits."); *Marasco*, 2006 U.S. Dist. LEXIS 7583, at *24 ("Accordingly, this matter is remanded to the Pension Board for a full and fair review in accordance with the standards set forth in the court's decision. The Pension Board is not limited to the information currently in the administrative record and is directed to seek more information. . . . Pension Board members should review all documents in the record anew and not rely on summaries from persons who participated in the Disability Committee's decision to deny benefits."); *Badawy*, 2005 U.S. Dist. LEXIS 21868, at *41 ("Therefore, this Court remands to First Reliance Standard, the claims review fiduciary, with the instruction that Mr. Badawy's application, along with

any additional evidence he wishes to submit, be reconsidered. . . .").[9]

## C. Retroactive Adjustment of Disability Start Date

Plaintiff claims that MetLife should retroactively adjust her disability start date to February 17, 2003, which is the date upon which the Social Security Administration retroactively entitled plaintiff to Social Security benefits. Defendants argue that the plain language of the SPD precludes plaintiff's claim. For the reasons set forth below, the Court disagrees with defendants and grants plaintiff summary judgment on this claim.[10]

In particular, plaintiff's argument regarding this claim centers on the following provisions in the SPD, discussed *supra*:

> You may temporarily recover from your Disability *during* your Elimination Period. If you become disabled again due to the same or related condition, you may not have to begin a new Elimination Period."
>
> If you return to work for 30 days or less *during* your Elimination Period, those days will count towards your Elimination Period. However, if you return to work for more than 30 days *before satisfying your Elimination Period*, you will

---

[9] In particular, to the extent that Aitkins has not yet submitted the following documents to MetLife, but wishes it to consider them on remand, MetLife should review: the Social Security Administration's decision to award plaintiff benefits, Dr. Brody's 2006 evaluation of plaintiff, and the evidence of plaintiff's hospitalization during the prior appellate process, as well as any documents created during or before Aitkins's two STD claims.

[10] As a threshold matter, the Court rejects Aitkins's argument that MetLife's refusal to consider her request for this adjustment, described *supra*, deprives defendants of deferential review on this claim. While the Court is aware that an administrator's failure to make decisions within the prescribed time period may mandate *de novo* review becauase such "inaction" means that the administrator did not exercise the discretion that warrants deferential review, *see Nichols*, 349 F.3d at 109, plaintiff has not pointed the Court to any cases stating that an administrator's failure to provide post-appeal discretionary decisions also mandates *de novo* review – particularly when the request that would give rise to such a decision is made after plaintiff has filed suit in federal court – and the Court declines to adopt such a rule here. Instead, because the SPD specifically gives the Plan administrator the "discretionary authority to interpret the terms of the Plan and to determine eligibility for and entitlement to Plan benefits in accordance with the terms of the Plan," the decision regarding whether clamant satisfied the Elimination Period under the SPD is reviewed under the arbitrary and capricious standard. However, even applying that deferential standard of review, plaintiff is still entitled to summary judgment on her claim for a retroactive adjustment of her disability start date, for the reasons discussed *infra*. Similarly, the Court rejects defendants' argument that they are entitled to summary judgment on this claim because plaintiff has not administratively exhausted it with MetLife. MetLife's letter dated July 27, 2007, discussed *supra*, explicitly states MetLife's position that Aitkins has administratively exhausted her claim. Given that explicit representation by MetLife, there is no basis under the circumstances of this case from which MetLife can argue that this claim is unexhausted.

have to begin a new Elimination Period.

(SPD at 6) (emphases added). Here, plaintiff received STD benefits from February 17, 2003 through July 27, 2003. On July 28, 2003, she returned to work, and continued to work until October 23, 2003.

Under well-settled Second Circuit law, "[a]n ERISA-regulated plan is construed in accordance with federal common law. Unambiguous language in an ERISA plan must be interpreted and enforced in accordance with its plain meaning. Language is ambiguous when it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement." *Gibbs v. Cigna Corp.*, 440 F.3d 571, 578-79 (2d Cir. 2006) (citations and quotation marks omitted). Further, "absent evidence indicating the intention of the parties, any ambiguity in the language used in an ERISA plan should be construed against the interests of the party that drafted the language." *Perreca v. Gluck*, 295 F.3d 215, 223 (2d Cir. 2002). "However, it is also a 'cardinal principle of contract construction[] that a document should be read to give effect to all its provisions and to render them consistent with each other.'" *Id.* (quoting *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 63 (1995)). Here, as set forth below, the Court finds that Aitkins satisfied the Elimination Period under the plain and unambiguous language of the SPD.

According to the SPD, a claimant may go back to work for thirty days or less during the Elimination Period and still satisfy the 180-day requirement. Here, it is undisputed that Aitkins stopped working on February 17, 2003. Thus, her Elimination Period ended 180 days from that date – that is, August 17, 2003. It is also undisputed that, when the Elimination Period

ended on August 17, 2003, she had worked only 20 days during the Elimination Period. According to the plain language of the Plan, because Aitkins returned to work for 30 days or less during the Elimination Period, those 20 days counted towards her Elimination Period and she satisfied the Elimination Period on August 17, 2003.

Defendants argue that, because Aitkins began working prior to the end of the Elimination Period (on July 28, 2003) and then continued working for more than 30 days until October 23, 2003, she had to begin a new Elimination Period. However, that interpretation is simply not supported by the plain language of the Plan. More specifically, the only days that matter for purposes of calculating whether a claimant has worked more than 30 days are those days that occur *during the Elimination Period*. In other words, once the Elimination Period ends on August 17, 2003, the counting stops. If the claimant has worked more than 30 days at the end of that 180-day period, a new Elimination Period must start. *See, e.g., Chionis v. Group Long Term Disability Plan for Edward Health Servs. Corp.*, No. 04 C 4120, 2006 WL 1895951, at *3 (N.D. Ill. July 7, 2006) ("Because Chionis had returned to work during the elimination period for more than 30 days from November 1, 2000 through January 10, 2001, pursuant to the terms of the LTD plan, he was required to satisfy a new elimination period. . . "). If the claimant has worked 30 days or less at the end of that 180-day period, the Elimination Period has been satisfied. As noted above, Aitkins only worked 20 days during the Elimination Period and, thus, the Elimination Period was satisfied when it ended on August 17, 2003. It is completely irrelevant whether the days worked during the Elimination Period were consecutive or not, or whether they occurred at the beginning or end of the

Elimination Period. For example, if Aitkins worked 29 single days during the Elimination Period, it still would be satisfied by August 17, 2003. Similarly, if Aitkins went back to work on August 16, 2003 and then worked for 35 continuous days before leaving work again, the Elimination Period would still have been satisfied on August 17, 2003.

To be sure, the Plan could have been written to prevent a claimant satisfying the Elimination Period in Aitkins's circumstances. If the defendant wanted to prevent a claimant such as Aitkins, who began a long period of continuous work towards the very end of the Elimination Period but did not reach the 30th day until she was beyond the 180-day mark, the defendant could have stated in the Plan that the days that the days spent at work do not count towards the Elimination Period. If that language had been added to this Plan, then Aitkins would have had only 160 days as of August 17, 2003 (because of the 20 days she had worked during the Elimination Period) and thus would have been unable to satisfy the 180-day Elimination Period. In fact, in some other cases where disputes have arisen regarding Elimination Period calculations, the Plan has explicit language to address such a situation – that is, it states the days a person is not disabled (or the days a person is at work) does not count towards the Elimination Period. *See, e.g., Pulvers v. First Unum Life Ins. Co.*, 210 F.3d 89, 93 (2d Cir. 2000) (interpreting plan containing provision stating: "[t]he days that you are not disabled will not count toward your elimination period"); *Neerdaels v. Group Short Term Disability and Long Term Disability Plan for Employees of Akamai Techs., Inc.*, No. C 04-00721, 2006 WL 515623, at *5 (N.D. Cal. Feb. 28, 2006) (interpreting plan containing provision that "[a]ny day that [claimant was] Actively at Work will not count towards the Elimination Period); *Toomey v. Unum Life Ins. Co. of Am.*, 324 F. Supp. 2d 220, 223 (D. Maine

2004) (interpreting plan containing provision that "days that the insured is not disabled will not count towards the elimination period"); *Castle v. Reliance Standard Life Ins. Co.,* 162 F. Supp. 2d 842, 853 (S.D. Ohio 2001) (interpreting plan containing provision that "[d]ays that the Insured is Actively at Work during this interruption period will not count towards the Elimination Period").

Here, although defendants may argue that the intention of the Plan was to prevent someone in Aitkins's situation from satisfying the Elimination Period, the Court's role is to read the plain language of the Plan, not the minds of the drafters. It is clear that under the plain and unambiguous language of this Plan, Aitkins satisfied the Elimination Period on August 17, 2003, and the Court declines defendants' invitation to ignore the explicit language of the Plan because it did not comport with how they expected the Plan to work. *See Pulvers,* 210 F.3d at 93 ("To be sure, there may be, as UNUM argues, sound policy reasons to apply a test like that in the Elimination Period Clause to circumstances like these. However, UNUM is required to enforce the Policy as it is written, not as it might have been written. . . .").[11] In short, given the defendants' strained construction of the unambiguous language of the SPD, the Court concludes that the defendant's refusal

---

[11] In any event, even assuming *arguendo* that the language "during your Elimination Period" and "before satisfying your Elimination Period" in the SPD was ambiguous as to the precise means by which a claimant may meet the thirty-day exception to the Elimination Period, the Court must construe these ambiguous provisions against MetLife. Thus, even if the language were ambiguous, the Court would find that Aitkins satisfied the Elimination Period that began on February 17, 2003.

28

to retroactively adjust the starting date of plaintiff's LTD benefits from October 23, 2003 to February 17, 2003 was arbitrary and capricious.

As a consequence of having satisfied the Elimination Period, plaintiff may apply the six month temporary recovery provision to her days of work between August and October 2003. Because it is undisputed that this period of work was less than six months, the Court finds it appropriate to retroactively adjust plaintiff's disability start date to February 17, 2003. The Court therefore grants summary judgment to plaintiff on this claim. On remand, MetLife should determine whether this adjustment affects its retroactive financial obligations to Aitkins, in light of the Court's ruling on the Social Security counterclaim, addressed *infra*.

D. Social Security Overpayment

For the reasons set forth below, the Court agrees with defendants that plaintiff must reimburse the Plan for any overpayment of benefits that resulted from plaintiff's award of Social Security benefits. Thus, the Court grants summary judgment to defendants on their counterclaim.[12]

Section 502 of ERISA provides that a fiduciary may bring a civil action "to obtain . . . appropriate equitable relief . . . to enforce . . . the terms of the plan." 29 U.S.C. § 1132(a)(3)(B). In *Sereboff v. Mid-Atlantic Medical Services, Inc.*, the Supreme Court interpreted this provision to permit a plan to obtain reimbursement from beneficiaries that

were awarded a civil settlement in a tort lawsuit. 547 U.S. 356, 363 (2006). In the analogous context of Social Security benefits, courts within the Second Circuit have consistently held that ERISA plan beneficiaries must reimburse the plan for retroactive overpayments arising from the award of Social Security benefits. *See, e.g., First Unum Life Ins. Co. v. Wulah*, No. 06 Civ. 1749, 2007 U.S. Dist. LEXIS 82650 (JCF), at *12 (S.D.N.Y. Nov. 8, 2007) (holding that "[u]nder the clear terms of the Plan, which are enforceable under ERISA and Second Circuit law, Mr. Wulah was overpaid and must reimburse First Unum" for an overpayment of disability payments arising from award of Social Security disability payments); *Fedderwitz*, 2007 U.S. Dist. LEXIS 72702, at *31-*32 (holding, in case where plaintiff "does not contest that he signed an Agreement to Reimburse Overpayment of Long Term Disability Benefits, nor that he has received SSDI benefits for the relevant period," that plaintiff had to reimburse plan for overpayment); *Unum Life Ins. Co. of Am. v. Lynch*, No. 04-CV-9007, 2006 U.S. Dist. LEXIS 7160, at *7-*8 (S.D.N.Y. Jan. 31, 2006) (granting summary judgment to plan on claim for reimbursement of overpayment due to Social Security benefit award, on theory of unjust enrichment); *Bressmer v. Federal Express Corp. Long Term Disability Plan*, No. 98-CV-4508, 1999 U.S. Dist. LEXIS 20708, at *16-*17 (E.D.N.Y. Sept. 27, 1999) (granting summary judgment to plan on counterclaim for reimbursement of overpayment arising from award of Social Security benefits).

Here, Aitkins does not dispute that she signed a reimbursement agreement. Further, she has failed to distinguish the circumstances here with the Supreme Court's holding in *Sereboff* or the district court cases in this Circuit that consistently agree with

---

[12] Although plaintiff opposed defendant's motion for summary judgment on the counterclaim in her motion papers, counsel for Aitkins conceded at oral argument that she was obligated to reimburse the Plan for any overpayment.

defendants' position. Therefore, the Court grants summary judgment to defendants on their counterclaim.

## V. Conclusion

For the foregoing reasons, the Court grants plaintiff's motion for summary judgment insofar as MetLife's decision on Aitkins's appeal is vacated, and on plaintiff's claim for retroactive adjustment of Aitkins's disability start date, and denies the motion on all other grounds. The Court grants defendants' motion for summary judgment on their counterclaim, but denies the motion otherwise. Further, the Court remands this case to MetLife for a full and fair review of plaintiff's claim. Because the Court recognizes that plaintiff has been without benefits for an extended period of time, the Court will retain jurisdiction over this case and instructs counsel for both parties to provide a report regarding the status of the remand within sixty days.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: March 25, 2008
Central Islip, NY

* * *

Plaintiff is represented by Wayne J. Schaefer, Esq., 200 Motor Parkway, Suite A3, Hauppauge, New York, 11747. Defendants are represented by Allan M. Marcus, Esq., of Lester Schwab Katz & Dwyer, LLP, 120 Broadway, New York, New York, 10271.